1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

- - - - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )        CRIMINAL CASE NO.
v.                               )           2:11cr00024
                                 )
ROBERT MURRAY,                   )
                                 )
        Defendant.               )
- - - - - - - - - - - - - - - - - - -


TRANSCRIPT OF PROCEEDINGS
**(Sentencing)**

Norfolk, Virginia

November 14, 2011


BEFORE:   THE HONORABLE ROBERT G. DOUMAR,
          United States District Judge


APPEARANCES:

          UNITED STATES ATTORNEY'S OFFICE
          By:  Kevin M. Comstock, Esquire
               Kathleen V. Dougherty, Esquire
               Assistant United States Attorney
               Counsel for the United States

          SWARTZ, TALIAFERRO, SWARTZ & GOODOVE, P.C.
          By:  W. L. Taliaferro, Jr., Esquire
               Franklin A. Swartz, Esquire
               Counsel for the Defendant


Heidi L. Jeffreys, Official Court Reporter

```
                        I N D E X


ON BEHALF OF THE DEFENDANT:      Direct   Cross   Red.    Rec.

A. P. Murray                       28       --      --      --







                      E X H I B I T S

No.                                                      Page

(None)
```

3

(The hearing commenced at 2:57 p.m.)

THE CLERK:  Criminal Case No. 2:11cr24, the United States of America v. Robert Murray.

Are counsel ready to proceed?

MS. DOUGHERTY:  The United States is ready.  Good afternoon, Your Honor.

MR. TALIAFERRO:  The defendant as well, Your Honor.

THE COURT:  All right, Mr. Taliaferro.

Mr. Murray, would you come forward to the podium, please, sir.

Mr. Murray, this is a sentencing hearing.  At this hearing you have the right to present a sworn or an unsworn statement before sentence is imposed.  You have a right to have your counsel speak for you, present any letters, writings, documents or witnesses that you think might be helpful to the Court in announcing the sentence to be imposed upon you.

Do you understand your rights before sentence is imposed?

THE DEFENDANT:  Yes, sir.

THE COURT:  Have you had an opportunity to go over the presentence report with your attorney, Mr. Taliaferro?

THE DEFENDANT:  Yes, sir.

THE COURT:  Is there anything that you feel is incorrect in the presentence report?

THE DEFENDANT:  No, sir.

THE COURT:  All right.  Mr. Taliaferro, I'll hear from you first.  Do you have anything you want to present?

MR. TALIAFERRO:  I would present one witness.

THE COURT:  One witness.

You can have a seat, Mr. Murray.

MR. TALIAFERRO:  Judge, could I pass up -- this is a -- there was a question in the presentence report about his income, and I just got this.  It doesn't change the guidelines in any way, and the government has no objection to me just putting that into the file.  It's his 2008 income tax return for a business that he had that shows an income of about forty-eight to fifty thousand dollars, I think.

As I say, it doesn't change anything, but I was just handed that this morning.

THE COURT:  My gracious!

MR. TALIAFERRO:  I don't intend to argue anything. I know that's coming in late.  I just -- they gave it to me, and I wanted to present it to the Court.

THE COURT:  Why was he in the -- why did he feel like he wanted to get in the darn marijuana business, then, Mr. Taliaferro?

MR. TALIAFERRO:  Well, I'll try to deal with that when the time comes.  I'd like to call my witness first, and then I'll try to deal with that.

A. Murray - Direct

THE COURT:  All right.  This has got to be filed under seal.  File it under seal, because it contains privacy information.

MR. TALIAFERRO:  Yes, sir.

(The witness was sworn by the clerk.)

THE COURT:  If you can, Miss, if you would be so kind, speak into the microphone, please.

AYANNA PATRICIA MURRAY, called as a witness, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TALIAFERRO:

Q.  Would you state your full name for us?

A.  Ayanna Patricia Murray.

Q.  And where do you live, Ms. Murray?

A.  I live in New York, Brooklyn.

Q.  And how old are you?

A.  I'm 16.

Q.  And Robert Murray here is your father?

A.  Yes.

Q.  Okay.  The people that are seated out here, are some of those your sisters as well?

A.  Yes, they are.

Q.  Could you tell me what their names are?

A.  Reyana Maya Murray, Ashley Akashay (phonetic spelling) Monet Reed.

Heidi L. Jeffreys, Official Court Reporter

A. Murray - Direct

Q. Okay. And who are some of the other people who have come here today?

A. Ruby Murray and Clara Murray.

Q. Okay. You said that Robert is your father?

A. Yes, he is.

Q. Let me ask you, how often do you talk to your father?

A. Every day.

Q. Okay. Do you visit with your father, or does he visit with you?

A. Yes.

Q. Can you give me some examples?

A. On the holidays, summertime, Christmastime, Thanksgiving. If we have like two days off from school, then we'll go down on the weekends and come back up on Mondays and stuff. We have fun.

Q. Has your dad been active in your life?

A. Yes, he has.

Q. Does he help you?

A. Yes, he does.

Q. Can you give me an example of how he helps you?

A. If we need school clothes, books for school, if we have any problems we can call and talk to him, he'll give us solutions to our problems -- anything.

Q. Okay. Thank you.

THE COURT: Do you have any questions of this

Heidi L. Jeffreys, Official Court Reporter

witness?

MS. DOUGHERTY:  None, Your Honor.

THE COURT:  Thank you very much.  You may step down.

MR. TALIAFERRO:  Judge, of course there are really two sets of cases here.  The one that deals with this registering to vote and so forth, I have to tell you that's as much of a mystery to me today --

THE COURT:  I'm not worried about that.

MR. TALIAFERRO:  -- as when I found out about that.

THE COURT:  What's really concerning me, Mr. Taliaferro, is the fact that this isn't penny ante marijuana.

MR. TALIAFERRO:  Yes, sir.

THE COURT:  It isn't.

MR. TALIAFERRO:  I agree, it's not a little, small amount or anything like that.  But if I could just say a couple of things here.

He's 44 years old.  He's a citizen of Guyana, but he has lived in this country legally for about 17 years.  He is a permanent resident.  You can see from the thing he's one of 21 children.  He graduated from high school.  He worked in his father's restaurant down there.  Now, he applied for citizenship on several occasions here, and it wasn't so much his record, it was the fact that he was still on this unsupervised probation for this DUI that he had and the

8

suspended license.  So he tried to do it right, tried to do it legally, and twice he was told that he had to reapply.

So I'll just concentrate on the 17 years that he's been here.  The government, I think, in their paper said he has a minimal criminal record.  He has no drug offenses up until this time.

THE COURT:  Well, the problem is that he ends up with three criminal history points.

MR. TALIAFERRO:  Well, I want to address that.  That's --

THE COURT:  I mean, a Criminal History Category of 3.  He has four criminal history points.

MR. TALIAFERRO:  That's right.  And I want to address that, because that is not so much what his record is, it's the fact that he was on this unsupervised probation for two traffic offenses that gave him two points.  And that's what kicked him up, and that's what gave him a Category 3 in this case.

So it's really not that his record is bad, it's a minimal record.  As I say, there are no drug offenses, no crimes of violence.  It looks like it's all pretty much traffic offenses.  There are no crimes of moral turpitude; lying, cheating, stealing or anything like that.  He's worked, for the most part, since he's been here in this country with the catering business.  That we know because

Heidi L. Jeffreys, Official Court Reporter

there was a business license that actually surfaced where he had a restaurant, La Versatile, from 2006 to 2009.  So, I mean, the business license verified that.  He had a valid license.  That came from the Commissioner of Revenue in Norfolk.  He was in the entertainment promotion business from 2007 until 2009.

And this is, I think, considerable:  He's got ten children.  Now, I will be the first to agree that he is considerably legally in arrears as far as these children are concerned, but he is, I think, a loving -- they've come down here from New York to be here today to vouch for him.  I sent you -- which I know you've read -- several letters from these children.  They say things like, "I love my father with all my heart."  "He taught me morals and values."  "He made me the young woman that I am today."  "He made me a strong and outspoken person."

So they obviously care a great deal about him, and despite the fact that he's behind in child support he's been active in their lives.  One of the letters says, "He's at all our birthdays and special occasions."  And then you have a letter from a mother of two of the children, and she says the same thing.  She says he's active with them.

THE COURT:  I don't doubt he's providing support, that he does a good job.  The problem is that's a lot of marijuana.  Not only does he have a lot of marijuana, but

Heidi L. Jeffreys, Official Court Reporter

10

he's got a gun.

MR. TALIAFERRO: Yes. Now -- yes, the gun was found underneath the couch in there. And I'll just say this: There's no evidence that he ever brandished it on anyone or anything like that. But, I agree, it's a fair amount of marijuana. It's by far not the most I've seen or even close to the most that I've seen, but it's a fair amount.

And I think in determining what to do with him we've got this possible likely deportation, which most defendants that come into this courtroom don't face that. And I think that is -- that's going to deprive the children of the benefit of him, that's going to deprive him from the children, if that's the case, and then there's the simple factor he has to serve five years. No matter what, he has to get five years.

And I think that's enough. And just as far as the cost of this -- I don't know what it costs to keep a person in prison for one or two or three extra years, but particularly when they're going to be deported, more than likely. So I just -- I don't know. I think if he is sentenced to the mandatory minimum I don't think that would result, really, in any disparity of sentence, given the fact that he's serving five years in this case.

I think his criminal conduct in the United States is certainly at an end, and I think if you sentence him to the

Heidi L. Jeffreys, Official Court Reporter

five-year minimum, given all the factors in this case, I think it would promote respect for the law, and I think it would deter others, knowing what's going to happen; that you have to go to prison for five years.

So taking into consideration he's got no violent record, no prior drug offenses -- the only reason he's a Category 3 is that he was on unsupervised probation for a traffic offense. So taking all of that into consideration, I think the mandatory minimum in this case is more than sufficient and would not result in disparity.

THE COURT: Wait just a minute. I -- did you look at what it would have been if he hadn't been on unsupervised probation?

It would have been a Category 3, because it takes two points off. It would be two points. He wouldn't be in a Category 2.

THE PROBATION OFFICER: 37 months.

MR. TALIAFERRO: 37 months, and he's got to do five.

THE COURT: It wouldn't make any difference to speak of, Mr. -- but the problem is everything else on top of it. He began to think he was a U.S. citizen.

MR. TALIAFERRO: That is a mystery to me. I'll tell you why.

When he went and bought that gun -- which he bought legally -- he didn't have to put down there that he was a

Heidi L. Jeffreys, Official Court Reporter

citizen because he was entitled to buy it.  You don't have to be a citizen.  He was legally in this country.  It makes no sense.

As far as this voting is concerned, that is a mystery to me.  I mean, this is not some little, small community where you can get together and swing an election or something like that.  His vote was like a -- I guess a sword swipe in the ocean.  I mean, it had virtually no effect at all.

THE COURT:  Well, it's unfortunate, but it's just another charge.

MR. TALIAFERRO:  It is.  It is.  So I just think, given his --

THE COURT:  Mr. Taliaferro, you make a nice argument.  You do, and he sounds good, but let me see what the government has to say, you know, and then I'll come back to you, Mr. Taliaferro.

MR. TALIAFERRO:  Thank you.

THE COURT:  All right, Ms. Dougherty, tell me about it.  Mr. Taliaferro thinks he's got a saint here.

MS. DOUGHERTY:  I understand, Your Honor.

Mr. Taliaferro has asked for a sentence of the mandatory minimum five years, and I think to do that would be to --

THE COURT:  Well, I'm not even considering that.

13

MS. DOUGHERTY:  Okay.

THE COURT:  So let's talk about it.

MS. DOUGHERTY:  We'll move right along, then.

Turning first to the nature and circumstances of this offense, there are two categories of what happened here. The first is that in November of 2010 the Norfolk Police Department were in his home legally and found 31,000 grams of marijuana, packaging materials, guns, scales.  This isn't a small operation.  It's a large-scale marijuana distribution operation.

And it's the gun they found in connection with that distribution operation that linked them to the second portion of his offense, and that is the seven separate times he falsely claimed to be a United States citizen and the benefits that accrued to him by virtue of those false claims; voting as an alien, falsely claiming citizenship and the ability to get that gun.  So I think the nature and circumstances of his offense weigh heavily against him and do not warrant a sentence at the low end of the guidelines range.

Further, the history and characteristics of this defendant -- he's fathered ten children with five different women, and while we we've heard from one today and through the letters you've heard from others, he was unable to provide contact information for five of these children.

Heidi L. Jeffreys, Official Court Reporter

THE COURT:  It sounded odd to me, but he did finally provide contact information.

MS. DOUGHERTY:  He did, but if you're so close to your children when the probation officer asks you for information I would think that you would be able to provide them information.

Secondly, he's over $200,000 in arrears in his child support obligations between New York and Virginia.

THE COURT:  Well, we all know what happens there. You know, once you get the government to start paying somebody something then they have to force a person to bring a suit.  And so then they bring the suit, and then they show they're not getting any money, and consequently we have Aid to Dependent Children.  So we know that the Aid to Dependent Children now is an incentive to not have a family, so the government doesn't want people to have families.  They pay an incentive not to have families.  They even pay an incentive for people not to do what their obligations are.  My gracious!  What a world we live in, isn't it?

MS. DOUGHERTY:  Yes, Your Honor.

THE COURT:  If the government keeps on, you know, pretty soon I don't know what they're going to do.  If a man moves into public housing the people have to move out.  Oh! So everything is designed to make sure that we have no families.  There's no reporter in here.  I'm not worried

about it getting in the newspaper.  I'm just telling you what it is.

What we really have is a government gone awry.  Do you think he's supporting the children?  No.  I don't.  The government is supporting the children.  We know that.  I'm sure he sends them some books and takes care of them now and then because he's making some money.  I just -- I'm so upset about the way we have Aid to Dependent Children and what's happening.  And you think -- I'm not worried about $200,000 in arrears.  That hasn't got anything -- he just -- if he paid money then maybe the Aid to Dependent Children wouldn't work.  Where are we going?  I don't know.  It's just when the government gets into social work you can be sure it's not good.  It just isn't good.

You know, it's funny.  I was thinking about this.  Some years ago I went to Russia.  It was communistic, horrible communism, but they did something with the children that I thought was unbelievable.  It was fantastic.  They said, "You drop the child off in the morning."  If it was necessary, they fed them breakfast.  If it was necessary, they fed them lunch.  If it was necessary, they fed them dinner.  They kept them all day so the people could go to work.  If the individuals wanted to have dinner with them they could come back, take them, and they could have dinner at home, depending on where they worked and what they did.

They didn't give the parents any money, but they took care to see that no child starved and the child got educated and the families stayed together.  Oh!  Suddenly, I said, you know, there are some good ideas in communistic Russia.  The thing is to protect the family, the most important thing.

You know, somebody said, "How did civilization come about?"  The family created civilization.  Now we want to destroy the family because we don't want to be civilized.  We want to be like animals.  Don't get me started into this nonsense.  I get so angry about what I think is happening in the world.

Have a seat.

MS. DOUGHERTY:  Thank you, Your Honor.

THE COURT:  Mr. Taliaferro, you just hit the wrong button.  You didn't know it, but you did.  I'm sorry.

I'll be glad to hear from you.  The question is the presentence report indicated that he didn't know where these five children were, to start with.  He didn't know how to contact them.

MR. TALIAFERRO:  Well, I don't -- I don't know whether -- I don't know whether they called him or he would call them.  I don't know whether that required an address, because these children live in different states.  I don't know.

But I think you were correct; he was able to provide

Heidi L. Jeffreys, Official Court Reporter

17

information from them.  He was able to talk to them.  He was --

THE COURT:  Well, he was.

MR. TALIAFERRO:  He was.  He was.  It's just sometimes people don't know the exact address or something like that.  He was able to do all of that.

And you can't get around the fact -- I mean, I'm with you on everything that you were saying, but it's clear that he has not been a non-factor in their life.  Now, some of these fathers -- not only do the families collect money; the father is a no-show, they never see him.  It's terrible. And it's not like that.  You've got to separate him from that category of fathers.

And, so, I just think he's got some good qualities. When you take that into consideration, this very, very minimal criminal record, I think that the mandatory minimum would be appropriate.  And I know you've said you're not going to do that, and I can accept that, but I just think something in that range, given the factors in this case, each case being unique --

THE COURT:  You know, the thing that interests me is he's got a nice -- he was paying his taxes.  He probably could have gotten to be an American citizen with no problem if somebody had gone and gotten rid of the probationary period, the 36 months.  He certainly was -- I think it was

18

something around 90 miles an hour, though.  He wasn't exactly driving slowly.  It was a rather serious problem with his driving.

MR. TALIAFERRO:  I agree with that.

THE COURT:  I mean, he wasn't riding an airplane, he was driving a car.

MR. TALIAFERRO:  All I can tell you is nobody got hurt.

THE COURT:  He was drunk and had marijuana in the car, too.  They didn't charge him with the marijuana.

MR. TALIAFERRO:  Well, I can just say that apparently, by way of his driving, nobody was injured or anything like that, and -- and, again, his record -- you can't get around it.  It is so minor for the cases you see --

THE COURT:  Well, you think it's minor.  I don't think it's so minor.

MR. TALIAFERRO:  Well, I mean, no crimes of violence.

THE COURT:  No, there isn't any crime of violence. To that extent I say that's good.

MR. TALIAFERRO:  He's got some good qualities.

THE COURT:  He had a little confusion about whether he was a citizen or not.  He said, "Well, I've been buying this" -- driver's license, voting -- I don't get so bent out of shape about that because he wanted it, but I do get bent

Heidi L. Jeffreys, Official Court Reporter

out of shape with 31,000 grams of marijuana.

MR. TALIAFERRO:  Yes, sir.  I can't argue with you on that.

THE COURT:  That's a lot of marijuana.

MR. TALIAFERRO:  It's a fairly large amount. There's no question.

THE COURT:  It's a lot of marijuana.  Adopting the presentence report, I have problems.  He had Counts Two -- Counts Two, Eight and Eleven are all fairly serious, fairly serious.

MR. TALIAFERRO:  I guess it's just what is adequate punishment for someone with his background with this case.  I think that's what it boils down to.  He's got some good --

THE COURT:  It's a tough road.  I understand that, Mr. Taliaferro.  I can appreciate what you say, but I have lots of problems, lots of problems.

It doesn't seem to be consistent with somebody who would file income tax returns and do things -- normally, we don't have people that have that much marijuana they're messing with who file income tax returns.

And one thing I -- well, I understand your position. The more I look at it I can bury some.  He's got some good traits, but it's still too much marijuana.

And the worry I have is what this leads to and where we're going with it and the fact that in the drunken driving

Heidi L. Jeffreys, Official Court Reporter

conviction originally there was marijuana and they didn't charge him with it.  But I think it had something to do with the severity of the sentence, which I thought was a little unusual, a little heavy, Mr. Taliaferro.

MR. TALIAFERRO:  Yes, sir.

THE COURT:  So I don't know who represented him. Did you represent him?

MR. TALIAFERRO:  No, I did not.  I didn't know Mr. Murray then.

THE COURT:  Oh.  I didn't know whether you represented him or not.  But somebody did a good job, because the marijuana didn't appear in the case.  Somebody did a good job.

MR. TALIAFERRO:  I can't tell you why that was done. I wish I could tell you.  I don't know.

THE COURT:  But, you see, what it led me to believe is that this wasn't something that he started overnight. He's been in the business for a while.

MR. TALIAFERRO:  Well, I think this much:  It had to have been a small amount, or he definitely --

THE COURT:  It probably was.

MR. TALIAFERRO:  Yeah.  So it could have been he was using it or something like that.

THE COURT:  It could have been.

MR. TALIAFERRO:  Yes.  Because if it was a large

amount you know he'd be charged.

THE COURT:  I'm not going to get into that, other than the fact that it was there.  And he doesn't seem to be a user.

MR. TALIAFERRO:  Well, again, all I can say is if it was a large amount you know they would have charged him with it.

THE COURT:  Mr. Taliaferro, the one nice thing about you is you can explain anything, you know?  You can.  That doesn't mean that I accept the explanations, I just say you can explain anything.  But I don't necessarily accept all the explanations.

MR. TALIAFERRO:  Yes, sir.

THE COURT:  I appreciate it.  I think the man has done a good job of trying to be a good citizen other than the fact that he got in the marijuana business a little heavy.

MR. TALIAFERRO:  Yes, sir.

THE COURT:  And that caused him to violate some other rules, and that is to claim that he was a U.S. citizen.  And it wasn't just one little thing.  It wasn't just to buy a gun, it was to vote.  It was to get a driver's license.  It was other factors.  You can't just say it was a minor mistake.  It wasn't.  It was a deliberate effort to mislead people.  It just doesn't operate to his benefit.

Thank you, Mr. Taliaferro.

Heidi L. Jeffreys, Official Court Reporter

All right.  Mr. Murray, if you would come forward, sir.

As I told you at the beginning, Mr. Murray, you have the right to make a sworn or an unsworn statement before sentence is imposed.  Do you desire to?

MR. TALIAFERRO:  Do you want to say something?

THE DEFENDANT:  Yes.

THE COURT:  Speak into the microphone.  You have a very quiet voice there.  Go ahead.

THE DEFENDANT:  (Pause.)  I am -- I love my kids very much, and I am sorry about...

(There was a pause in the proceedings.)

THE DEFENDANT:  I made -- I made a bad mistake, and I'm very sorry about it.  And I love my kids very much.  I'll always, you know, be with my kids.  And I am really sorry.

THE COURT:  I can understand that, Mr. Murray.  I can understand that.

Your total offense level is 18.  Your Criminal History Category is 3.  It could easily be 2.  It's in between the two because of the problem of the extent of the unsupervised probation.

But the problem is the tremendous amount of marijuana.  Under Count Two -- we're talking about in all of these matters a substantial sentence.  As I look at it, your guideline provisions would be -- for custody, even combining

them, would be 33 to 41 months, without regard to the weapon. The weapon causes a monstrous problem because it's a mandatory consecutive 60-month sentence.  And it does.

You falsely claimed citizenship in the United States.  You registered to vote and voted on November the 4th, 2008, in the federal election.  A kilogram weighs 2.25 pounds.  That's a lot of marijuana.  It's close to 70 pounds of marijuana.

You have some problems yourself, probably, with traffic violations.  I don't get too bent out of shape about them, but it is taken into consideration.

Taking all of this into consideration, pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Robert Murray, is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 96 months.  The term consists of 36 months on each of Counts Two, Eight and Eleven, to be served concurrently, a term of 12 months on Count Nine, to be served concurrently, and a term of 60 months on Count Four, to be served consecutively.

The defendant is remanded to the custody of the United States Marshal.  Upon release from imprisonment the defendant shall be placed on supervised release for a term of five years.  This term consists of five years on Count One, a term of three years on Counts Two and Eight, and a term of

Heidi L. Jeffreys, Official Court Reporter

24

one year on Counts Nine and Eleven, all to run concurrently.

The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of commencement of supervision and at least two periodic drug tests thereafter, as may be directed by the probation officer.

While on supervision the defendant shall not commit another federal, state or local crime, shall not unlawfully possess a controlled substance, shall not possess a firearm or destructive device.

The defendant shall comply with the standard conditions that have been adopted by this Court and also comply with the following additional conditions:

As a condition of supervised release, upon completion of his term of imprisonment the defendant is to be surrendered to a duly authorized immigration official of the Department of Homeland Security, United States Immigration and Customs Enforcement, for a deportation review in accordance with established procedures provided by the Immigration and Naturalization Act.

As a further condition of supervised release, if ordered deported the defendant shall remain outside of the United States.  If not deported, the defendant shall pay for the support of his children in the amount ordered by any social service agency or court of competent jurisdiction.  In

the absence of such order, payments are to be made on a schedule to be determined by the Court from time to time based on the defendant's financial circumstances as it may be recommended by the probation officer.

If not deported, the defendant shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial costs to be paid by the defendant, all as may be directed by the probation officer.

The Court has considered the defendant's negative net worth and lack of liquid assets, his lifestyle and financial needs, as reflected in the presentence report, his earning potential as a caterer, restaurant owner and promoter and ten dependents relying on his support.

The Court finds the defendant is not capable of paying a fine; however, the defendant shall pay the following total penalties:

As to Count Two the defendant shall pay a special assessment in the amount of $100.  As to Count Four the defendant shall pay a special assessment in the amount of $100.  As to Count Eight the defendant shall pay a special assessment in the amount of $100.  As to Count Nine the defendant shall pay a special assessment in the amount of

$25.  As to Count Eleven the defendant shall pay a special assessment in the amount of $100.  Total special assessment due is $425.  There's no restitution and no fine.

Payment of criminal monetary penalties shall be as follows:  The special assessment shall be due in full immediately.  Any balance remaining unpaid on the special assessment at the inception of supervision, if not sooner paid, shall be paid by the defendant in installments of not less than $50 per month until paid in full.  Said payments shall commence 60 days after defendant's supervision begins.  Any special assessment payments may be subject to penalties for default and delinquency.  Nothing in the Court's order shall prohibit the collection of any judgment, fine or special assessment by the United States.

Since this judgment imposes a period of imprisonment, payment of criminal monetary penalties, including the special assessment, shall be due during the period of imprisonment.  All criminal monetary penalty payments, including the special assessment, are to be made to the Clerk, United States District Court, except those payments made through the Bureau of Prisons Inmate Financial Responsibility Program.

The defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence or mailing address until all special

assessments imposed by this judgment are fully paid.

Now, Mr. Murray, you have a right to appeal.  If you desire to appeal, your appeal must be in writing and filed within -- the notice of appeal must be filed within ten days from the date hereof.

Anything further need be done in this matter, Ms. Dougherty?

MS. DOUGHERTY:  Yes, sir, Your Honor.  The United States would move to dismiss the remaining counts of the indictment.

THE COURT:  The remaining counts of the indictment to which the defendant has not pled guilty are hereby ordered dismissed.

Anything else, Mr. Taliaferro?

MR. TALIAFERRO:  No, sir.

THE COURT:  All right.  We'll recess.

He's remanded to the custody of the United States Marshal, if I didn't say it.

(The hearing adjourned at 3:37 p.m.)

Heidi L. Jeffreys, Official Court Reporter

CERTIFICATION


     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


                         s/s

                   Heidi L. Jeffreys


                   January 28, 2013

                        Date


Heidi L. Jeffreys, Official Court Reporter